```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION
```

Diana G. Wotring,                :

      Plaintiff,             :

    v.                           :     Case No.  2:14-cv-998

                                   :     JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,       Magistrate Judge Kemp

      Defendant.             :

                    REPORT AND RECOMMENDATION

                     I.   <u>Introduction</u>

    Plaintiff, Diana G. Wotring, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits.  That application was filed on April 10, 2012, and alleged that Plaintiff became disabled on October 15, 2011.

    After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on October 17, 2013.  In a decision dated November 21, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on June 9, 2014, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on October 2, 2014.  Plaintiff filed her statement of specific errors on October 31, 2014, to which the Commissioner responded on February 13, 2015.  A reply brief was filed on February 27, 2015, and the case is now ready to decide.

    II.  <u>Plaintiff's Testimony at the Administrative Hearing</u>

    Plaintiff, who was 53 years old at the time of the administrative hearing and who has a ninth grade education, testified as follows.  Her testimony appears at pages 62-76 of the administrative record.

    Plaintiff last worked in October, 2011.  She was a

department manager at a Wal-Mart store, a job which involved lifting. Plaintiff could not lift more than 30 pounds, however, due to medical restrictions. She had also been a cashier and a stock person.

The conditions which precluded Plaintiff from working included tingling in her legs and depression. She had difficulty walking and could sit only half an hour, moving her legs constantly. She could not lift more than ten pounds. She spent much of her day sitting down or lying down. She also lost feeling in her hands and arms. She also had trouble climbing stairs and often could not focus on television programs. She could dress and bathe herself and was able to drive, but did not like being around people. She used the microwave but did not cook meals, and she did no other household chores. Her medications caused drowsiness. They included Percocet and morphine.

In a typical day, Plaintiff would lie down for two or three hours and take catnaps. She did not sleep well at night. She experienced frequent crying spells and had little appetite. She was going to set up an appointment to see a counselor for depression.

### III.  The Medical Records

The medical records in this case are found beginning on page 240 of the administrative record. The pertinent records can be summarized as follows.

The first record shows that on January 19, 2011, Plaintiff was seen at the Doctors Hospital Emergency Room complaining of hip pain. The diagnoses included exacerbation of chronic hip pain, back pain, lumbar strain, and osteoarthritis. She was prescribed Vicodin and discharged. (Tr. 240-44).

Next, there are 17 pages of records from Plaintiff's family physician's office showing that she had a history of treatment

for hip and back pain. She received treatment for other conditions as well, but they do not appear to be pertinent to this case. The next pertinent record documents an emergency room visit in August, 2011, where Plaintiff was treated for right-sided back pain radiating into her right thigh. Again, she was prescribed medications, including Percocet and Flexeril, and discharged. (Tr. 275). Three weeks later, she was back in the emergency room with similar problems and received similar treatment. (Tr. 284). She underwent a CT scan later in 2011 which showed severe degenerative disc disease at L4-5 and L5-S1. (Tr. 302). A subsequent test showed S1 radiculopathy on the right side, described as moderate and chronic. (Tr. 362). Plaintiff continued to receive treatment for her hip and back pain into 2012.

Plaintiff was again seen at the emergency room in March, 2012. At that time, her primary diagnosis was fibromyalgia syndrome. She was given a prescription for gabapentin and discharged. (Tr. 397-98). That diagnosis is repeated in subsequent medical records.

Dr. Meyer, a psychologist, performed a psychological evaluation of Plaintiff on May 31, 2012. Plaintiff described her main complaints as back and leg problems, with a diagnosis of fibromyalgia. From a psychological standpoint, she reported difficulty sleeping, loss of appetite, isolation, and anxiety. She said that her relationship with supervisors had deteriorated in the last few years that she worked but that she got along well with coworkers. She socialized several times per week and did housework once a week as well. Plaintiff was frequently tearful during the interview. Her insight and judgment were adequate. Dr. Meyer diagnosed major depressive disorder and adjustment disorder with anxiety, and rated Plaintiff's GAF at 55. In Dr. Meyer's view, Plaintiff could follow basic work instructions,

could maintain attention for simple tasks only, would suffer from increased absenteeism if she had to relate to others over sustained periods of time, and could deal with only low stress work situations.  If stressful situations arose, she would fail to complete tasks and be increasingly absent from work.  (Tr. 419-29).

There are a large number of records from Chillicothe Acute Care Clinic, the pain management clinic which treated Plaintiff throughout 2012.  The notes are similar, showing that Plaintiff reported weakness and numbness in her legs and pain in her back, hips, and ankles.  She continued to receive medication.  She subjectively rated her pain as varying from 6 to 9 on a ten-point scale.  Her treating doctor at the pain clinic was Dr. Yazdanbakhsh, and Dr. Yazdanbakhsh completed a physical capacity evaluation form on February 1, 2013, indicating that Plaintiff could sit for four hours in a workday and stand and walk for two hours each, doing each activity no more than thirty minutes at a time, and that she could lift up to ten pounds occasionally, could not use her hands for repetitive pushing, pulling, or fine manipulation, could never use her feet to operate foot controls, and could not squat, climb steps, or climb ladders.  She was also likely to deteriorate under work stress and would miss more than five days of work per month.  Dr. Yazdanbakhsh cited, as support for her opinion, the diagnoses of fibromyalgia and degenerative disc disease and noted that Plaintiff experienced increased pain in stressful situations.  (Tr. 463-64).

In addition to the records of examination or treatment, the file also contains reviews by state agency physicians. Dr. Maryi, a psychologist, concluded on July 2, 2012, that Plaintiff suffered from an affective disorder which was not severe enough to satisfy the "B" criteria of section 12.04 of the Listing of Impairments.  (Tr. 88).  Dr. Maryi gave "great weight" to Dr.

Meyer's assessment (Tr. 89), and concluded that Plaintiff had a moderate limitation in her ability to understand, remember, and carry out detailed instructions, to complete a workday and work week without interruption from psychologically-based symptoms, to interact with the general public, to get along with coworkers, to adapt to changes in the work setting, and to accept criticism from supervisors. However, Plaintiff could adapt to a setting in which duties were routine and predictable and where changes were well-explained and introduced slowly. (Tr. 91-93). Dr. Voyten concurred in these findings. (Tr. 105-07).

Dr. Torello assessed Plaintiff's physical capacity. She found that Plaintiff could do light work with some postural limitations, including being able to climb ramps, stairs, ladders, ropes, and scaffolds occasionally and being able to stoop, kneel, crouch, and crawl occasionally as well. (Tr. 89-90). Her opinion was rendered on June 19, 2012, well before Dr. Yazdanbakhsh completed her physical capacity evaluation form. Another state agency physician, Dr. Gallagher, agreed, but her opinion also preceded that of Dr. Yazdanbakhsh. (Tr. 103-05).

### IV. The Vocational Testimony

Carl Hartung was the vocational expert in this case. His testimony begins on page 76 of the administrative record.

Mr. Hartung testified that Plaintiff's past position as a department manager was medium and skilled. She had no other past relevant work.

Mr. Hartung was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level and who could occasionally climb ramps, stairs, ropes, ladders and scaffolds. The person could also occasionally stoop, kneel, crouch, and crawl. Further, the person could perform only simple, routine, repetitive tasks in a relatively static

environment with no more than occasional and superficial contact with others. Lastly, the person could not meet strict time or production demands. According to Mr. Hartung, someone with those limitations could not do Plaintiff's past job but could work as a housekeeping cleaner, marker, or laborer. He also testified to the number of these jobs which exist in the regional, State, and national economies.

Mr. Hartung was then asked whether someone with those same restrictions, as well as a restriction to simple tasks only, and whose interaction with others would lead to absenteeism, could work. He said no. The same was true of someone who could only sit, stand, and walk for a total of six hours in a workday and who had other limitations including missing five days of work per month. Taking an additional 30-minute break during the work day, on top of regular work breaks, was also not consistent with sustained employment. Finally, Mr. Hartung testified that someone who could stand or walk for up to four hours in a workday but was limited to lifting ten pounds rarely could perform only sedentary work.

    V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 35-52 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements of the Social Security Act through December 31, 2016. Next, he found that she had not engaged in substantial gainful activity since her alleged onset date of October 15, 2011. Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including degenerative disc disease, fibromyalgia, depression, and anxiety. The ALJ also found that these impairments did not, at any time, meet or equal the requirements

of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level but that she could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and only occasionally stoop, kneel, crouch and crawl. Further, she could do simple, routine, repetitive tasks with no strict time or production demands and could have occasional superficial contact with supervisors, co-workers, and the general public in a relatively static work environment with static work processes and procedures.

The ALJ found that, with these restrictions, Plaintiff could not do her past relevant work.  However, she could do the jobs identified by the vocational expert, including housekeeping cleaner, marker, and laborer.  The ALJ further found that such jobs existed in significant numbers in the regional, State, and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.   Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ did not identify a particular opinion as coming from a treating source, Dr. Yazdanbakhsh, thus failing to afford it proper weight; and (2) the ALJ incorrectly evaluated the opinion of the examining psychiatrist, Dr. Meyer  These claims are evaluated under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402

-7-

U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Dr. Yazdanbakhsh's Opinion

Plaintiff's first claim of error is that the ALJ did not properly identify Dr. Yazdanbakhsh's opinion as coming from a treating source.  She also argues, briefly and in her reply, that if the ALJ did understand that Dr. Yazdanbakhsh was both a treating source and the physician who completed the February, 2013 physical capacity evaluation form, the ALJ failed to apply the proper factors which, by regulation (20 C.F.R. §404.1527(c)) are to be used when determining how much weight to give to a treating source opinion.  The Commissioner asserts that the ALJ followed the proper procedure and was clearly aware of the treating relationship.

As always, the Court begins its analysis of this type of claimed error by scrutinizing the ALJ's decision.  Here is what

the ALJ said about Dr. Yazdanbakhsh's opinion.

First, the ALJ summarized the opinion at Tr. 44, saying that "a doctor at this pain clinic [Chillicothe Acute Care Clinic] completed a prepared physical capacity evaluation form checking yes to the question of whether the claimant would miss five or more days of work a month."  The ALJ then described the other limitations in the report, and concluded with this statement: "Although the claimant testified that she is treating with Dr. Yadanbakhsh [sic], the doctor at the pain clinic, there are no more recent records from this provider."

Commenting upon the opinion evidence later in the administrative decision, the ALJ said:

> Little weight is given to the form entitled Physical Capacity Evaluation completed by a doctor at the pain clinic in February, 2013, as said opinion is not supported by objective medical evidence, is highly dependent upon the claimant's reports of symptoms and limitations where the claimant is found to be not wholly reliable as a reporter of symptoms and limitations, and is not consistent with the credible portion of activities of daily living (Exhibit 18F). Furthermore, the doctor's own records do not support the severe restrictions in this opinion.  The doctor opined that the claimant had the inability to use her hands for repetitive pushing and pulling and fine manipulation ....  Yet in May, 2013, the claimant told the nurse practitioner that she had been doing a lot of cross-stitching and using the computer (Exhibit 20F). The doctor herself had noted repeated instances of the claimant failing to comply with treatment.  There is nothing in the record that would support such frequent absences from work or the severe limitations noted in the opinion.

(Tr. 49).  Elsewhere, the ALJ had noted that there were significant gaps in Plaintiff's treatment history, that there were many negative findings during physical examinations, that she was not always compliant with medications, and that she performed a fairly full range of daily activities.  (Tr. 46-48).

Taking Plaintiff's primary contention first, it is clear to

the Court that the ALJ understood that the February, 2013 opinion came from Dr. Yazdanbakhsh. The ALJ specifically referred to the doctor who authored that opinion as "herself," see Tr. 49, a reference which makes no sense if the ALJ was unclear about which physician completed the form. Further, the ALJ also understood that Dr. Yazdanbakhsh was a treating source. Plaintiff so testified at the hearing, and the administrative decision acknowledged that testimony ("she [Plaintiff] reports that she is still treating with Dr. Yazdanbakhsh" and "she testified that she is still treating with same pain doctor," see Tr. 48) and also discusses a series of visits to the pain clinic and the contents of treatment records from that source. Consequently, while the ALJ never specifically used the words "treating physician" in connection with Dr. Yazdanbakhsh, he understood that to be the relationship.

The remainder of Plaintiff's argument, articulated most clearly in her reply, focuses on whether the ALJ's analysis of Dr. Yazdanbakhsh's opinion complies with the "treating physician" rule. It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of

-10-

HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

    Here, the Court finds that the ALJ complied with these rules of decision.  He specifically found that Dr. Yazdanbakhsh's opinion was not entitled to much weight based on the lack of support for her findings in her own records as well as the lack of support from other sources.  He also pointed to inconsistencies between Plaintiff's reports of her activities of daily living, including using a computer and doing cross-stitching, both of which require use of the hands and arms and involve manipulation, and Dr. Yazdanbakhsh's conclusions on those subjects.  Additionally, he noted the lack of support in the record for the conclusion that Plaintiff would miss five or more days of work per month.  The rationale provided, quoted in full above, is a sufficient articulation of the ALJ's decision-making process to satisfy Wilson, and it touches on a sufficient number of the §404.1527(c) factors - with corresponding support in the record - to satisfy the substantive component of the rule as well.  Consequently, the Court finds no merit to Plaintiff's first statement of error.

### B.   Weighing Dr. Meyer's Opinion

    Plaintiff's second claim addresses the psychological evidence.  As Plaintiff notes, when asked a hypothetical question which closely tracked Dr. Meyer's view of Plaintiff's psychological limitations, the vocational expert stated that a person with those limitations could not sustain employment. Plaintiff further points out that the two state agency

-11-

psychologists, Drs. Maryi and Voyten, expressly assigned "great weight" to Dr. Meyer's opinion.  From these two facts, plus the ALJ's decision to afford great weight to their opinions, Plaintiff concludes that the ALJ did not have a reasonable basis for adopting any view of Plaintiff's psychological limitations other than Dr. Meyer's.

    This argument, while facially appealing, is ultimately unpersuasive.  There are differences between the conclusions reached by Dr. Maryi and by Dr. Meyer, particularly in the area of how Plaintiff would be able to handle stress caused by having to relate to others in the workplace.  Dr. Meyer appeared to conclude that any significant amount of interaction would cause Plaintiff to withdraw and isolate, thus leading to excessive absenteeism - or, at least, that is how Mr. Hartung, the vocational expert, interpreted that part of Dr. Meyer's opinion.  The state agency reviewers, however, concluded that while Plaintiff had moderate limitations in her ability to deal with others, she could adapt to a work setting in which duties were routine and predictable and where changes were well-explained and introduced slowly as long as her contact with others was superficial; as Dr. Maryi concluded, Plaintiff "can relate adequately on a superficial basis."  (Tr. 92).  The real question is not whether the ALJ rejected or misconstrued the state agency opinions because they gave great weight to Dr. Meyer's evaluation and he did not; it is whether the ALJ had a substantial basis for choosing to credit their view of Plaintiff's limitations rather than Dr. Meyer's.  <u>See Blankenship v. Comm'r of Social Security</u>, 2014 WL 3734362, *9 (S.D. Ohio July 29, 2014)("[i]t is up to the ALJ to choose among competing medical opinions, and so long as the ones he chooses are supported by substantial evidence in the record, the Court cannot disturb that choice").

    Here, the ALJ explained that he gave somewhat less weight to Dr. Meyer's opinion because some of her conclusions were based on

Plaintiff's self-report of symptoms and because they were not consistent with Plaintiff's activities of daily living.  (Tr. 49).  Although most psychological evaluations are based on self-reported symptoms, here the ALJ found Plaintiff not to be a completely reliable self-reporter, and Plaintiff has not challenged his credibility finding.  Also, the ALJ noted that Plaintiff at various times described a wide range of daily activities including preparing meals, washing dishes, doing laundry, sweeping, walking, driving shopping, paying bills, watching television, socializing with relatives, and babysitting (Tr. 46).  While these activities might not mandate a conclusion that Plaintiff could work competitively, they are some evidence that she may not be as affected by dealings with others as Dr. Meyer seemed to indicate.  The ALJ also noted that Plaintiff had not experienced significant problems getting along with others while she was working and that she was never fired or laid off based on difficulties in this area.  All of these statements are supported by the record, and a reasonable person could have found, as did the ALJ, that Plaintiff did have the abilities described in the state agency psychologists' report.  Under these circumstances, and given that "[an] ALJ [i]s not required to uncritically accept the conclusions of [a] onetime examiner," Tate v. Comm'r of Social Security, 2014 WL 4536929, *19 (E.D. Mich. Sept.11, 2014), the Court finds no error in the ALJ's assessment of Plaintiff's mental residual functional capacity.  Consequently, Plaintiff's second assignment of error also lacks merit.

## VII.   Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner.

## VIII.   Procedure on Objections

If any party objects to this Report and Recommendation,

that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge